1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

RAUL GONZALES,

                     Petitioner,

    v.

WILLIAM GITTERE, et al.,

                 Respondents.

Case No. 2:21-cv-02055-GMN-DJA

**Order Denying Petition for Writ of Habeas Corpus and Granting a Certificate of Appealability**

## I.    Summary

In 2013, Petitioner Raul Gonzalez was convicted by guilty plea in Nevada for Conspiracy to Commit Robbery and Robbery and was sentenced to concurrent terms of imprisonment for Life Without the Possibility of Parole as a Habitual Criminal. (ECF Nos. 14-4; 14-6; 36-15 at 69.) Gonzales filed a Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254 (ECF No. 27) ("Petition") alleging (1) the prosecution breached the plea agreement when it sought punishment as a Habitual Criminal; (2) the sentencing court improperly relied on gang-related evidence at sentencing; and (3) he was improperly adjudicated a Habitual Criminal based on charges for which he was not convicted at the time of sentencing.  For the reasons discussed below, the Court denies the Petition and grants a Certificate of Appealability for Grounds I and II of the Petition.

## II.    Background Summary[1]

On January 4, 2011, Las Vegas Metropolitan Police Department ("Metro") Officers responded to a call about a Robbery with Use of a Deadly Weapon. (ECF No. 40-1 at 7.)  One of the victims said Raul Gonzales and Alexander Uceda produced guns, forced the victim to the ground, and took money from his pockets and wallet. (*Id.*)  The victim claimed Uceda took property from passengers in the victim's vehicle at gunpoint. (*Id.*)  The victim attempted to flee in

---

[1] The Court makes no credibility, factual, or other findings regarding the evidence presented in the state courts.  This background summary is based on the state-court record and serves as merely a backdrop to the Court's consideration of the issues presented in the case.  Failure to mention specific evidence or a category of evidence does not signify the Court overlooked it in considering the claims in the Petition.  The facts underlying the offenses are summarized based on the Presentence Investigation Report.

his car and heard gunshots. (*Id.*)  The victim's car was struck twice in the trunk. (*Id.*)  The victim identified Gonzales, Uceda, and Jennifer Ramirez, as the perpetrators. (*Id.*)

Gonzales, Uceda, and Ramirez were charged by information with, among other things, Conspiracy to Commit Robbery ("the robbery case" or "the instant case"). (ECF No. 14-3.) Additional charges against Gonzales included (1) two counts of Robbery With Use Of A Deadly Weapon, (2) Attempted Robbery With Use Of A Deadly Weapon, (3) three counts of Attempted Murder With Use of a Deadly Weapon, (4) three counts of Assault With a Deadly Weapon, (5) Discharging A Firearm At Or Into A Structure or Vehicle, and (6) Possession Of a Firearm by an Ex-Felon. (*Id.*)  Gonzales posted bail in December of 2012. (ECF No. 33-15 at 2–3.)

In December of 2013, Gonzales was charged with Possession/Manufacture/Dispose of Short-Barreled Rifle/Shotgun, Grand Larceny Auto, and Possession/Receiving/Transfer of a Stolen Vehicle ("the stolen vehicle case"). (ECF No. 40-1 at 6.)  The State moved to revoke bail in the robbery case, and the defense requested a continuance for possible change of plea as "recent developments have caused some movements on both sides." (ECF No. 33-22 at 3.)

Gonzales pleaded guilty in the robbery case under a Guilty Plea Agreement ("plea agreement") to Conspiracy to Commit Robbery and Robbery. (ECF Nos. 14-4; 33-23 at 3–9.)  As part of the plea negotiations, Gonzales was released pending sentencing. (ECF No. 33-23 at 9–11.) Gonzales was later arrested in a third case for, *inter alia*, First-Degree Murder ("the murder case"). (ECF Nos. 34-2 at 36; 40-1 at 7.)  In the robbery case, he was sentenced as a Habitual Criminal to concurrent terms of Life Imprisonment Without the Possibility of Parole. (ECF No. 14-6.)

On direct appeal, the Nevada Court of Appeals vacated the judgment and remanded for determinations related to Gonzales's Motion to Withdraw his Guilty Plea. (ECF No. 14-9 at 8–11.)  Following an evidentiary hearing, the state district court denied the motion and reinstated the Judgment of Conviction. (ECF No. 36-15 at 69.)  That decision was affirmed on direct appeal. (ECF No. 14-12.)  Gonzales unsuccessfully sought post-conviction relief. (ECF No. 14-18.)

### III.    Governing Legal Standards of Review

The Antiterrorism and Effective Death Penalty Act (AEDPA) provides the legal standards for consideration of Gonzales's petition:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court is not required to cite Supreme Court cases or even be aware of them, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002). A state court's decision is contrary to clearly established Supreme Court precedent, within the meaning of § 2254(d)(1), "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). A state court's decision is an unreasonable application of clearly established Supreme Court precedent under § 2254(d)(1), "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous . . . [rather] [t]he state court's application of clearly established law must be objectively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at 409–10, 412) (internal citation omitted).

A federal habeas court may not characterize state-court factual determinations as unreasonable "merely because [it] would have reached a different conclusion in the first instance." *Brumfield v. Cain*, 576 U.S. 305, 313–14 (2015) (citing *Wood v. Allen*, 558 U.S. 290, 301 (2010)). "Instead, § 2254(d)(2) requires that [a federal habeas court] accord the state trial court substantial deference." *Id.* "If "'[r]easonable minds reviewing the record might disagree' about the finding in

question, 'on habeas review that does not suffice to supersede the [state] court's . . . determination.'" *Id.* However, "[e]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review," and "does not by definition preclude relief." *Id.* (citing *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003)).

The Supreme Court has instructed that "a state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  The Supreme Court has stated that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102 (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the standard as a "difficult-to-meet" and "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.") (internal citations omitted).  The petitioner carries the burden of proof. *See Cullen*, 563 U.S. at 181 (citing *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002)).

## IV.   Discussion[2]

### A.   Ground I—Violation of the Plea Agreement

Gonzales alleges his rights to due process and equal protection were violated because he was sentenced as a Habitual Criminal in violation of the terms of his plea agreement. (ECF No. 27 at 8.) He claims the plea agreement allowed the State to argue for a sentence as a Habitual Criminal "if an independent magistrate, by affidavit review, confirms probable cause against [Gonzalez] for new criminal charges," but he was instead indicted by a Grand Jury. (*Id.* at 11.) He argues a Grand-

---

[2] Gonzales alleges the standard of review proscribed by 28 U.S.C. § 2254(d) violates the U.S. Constitution, specifically the Suspension Clause (Article One, Section Nine, clause two); fundamental principles of separation of powers (Articles One, Two, Three); the ban on cruel and unusual punishments (Amendments Eight and Fourteen); and the guarantee of due process (Amendments Five and Fourteen). (ECF No. 27 at 7–8.)  In their Answer to the Petition, Respondents request that the Court decline to consider these arguments because Gonzales has provided no legal citations or analysis to support these assertions. (ECF No. 42 at 7 n.5.)  Gonzales concedes the Ninth Circuit Court of Appeals has rejected arguments that AEDPA violates the Suspension Clause and the separation of powers doctrine. (ECF No. 27 at 7–8) (citing *Crater v. Galaza*, 491 F.3d 1119 (9th Cir. 2007)).  Rule 2(c) of the Rules Governing Section 2254 Cases requires a federal habeas petition specify all grounds for relief and "the facts supporting each ground."  Conclusory allegations unsupported by specific facts may be summarily dismissed. *Mayle v. Felix*, 545 U.S. 644, 649, 655–56 (2005); *Blackledge v. Allison*, 431 U.S. 63, 74 (1977).  Because Gonzales does not provide any legal citations or analysis to support his assertion that the standard of review in 28 U.S.C. § 2254(d) violates the U.S. Constitution, the Court declines to consider this argument.

Jury Indictment is not a substitute for a magistrate's finding of probable cause and therefore the State breached the plea agreement by seeking punishment as a Habitual Criminal. (*Id.* at 10–11.) He alleges the Nevada Court of Appeals unreasonably determined the plea agreement permitted the State to seek a sentence as a Habitual Criminal regardless of that condition. (ECF Nos. 27 at 8–12; 52 at 5–14.)   Respondents contend the State did not promise to refrain from seeking punishment as a Habitual Criminal, and, even if it improperly sought Habitual Criminal status, Gonzales was not prejudiced because the State retained the right to argue at sentencing, Gonzales acknowledged he could face punishment as a Large Habitual Criminal, and habitual adjudication was based on Gonzales's prior felony convictions. (ECF Nos. 42 at 9–12; 62 at 1–4.)   For the reasons discussed below, the Court is compelled to find that the state appellate court made an objectively unreasonable determination of fact in light of the evidence presented in the state-court proceedings, i.e., that the State had an unqualified right to seek punishment as a Habitual Criminal under the plea agreement. 28 U.S.C. § 2254(d)(2).  However, on *de novo* review, the Court denies Ground I because the state record fails to show the State breached the plea agreement.

### 1.    Additional Background

#### a.    The Terms of the Plea Agreement

According to the written plea agreement executed by the parties, Gonzalez agreed to plead guilty to Conspiracy to Commit Robbery and Robbery. (ECF No. 14-4 at 2.)  Gonzales confirmed he understood that, as a consequence of the plea, the state district court was required to sentence him to imprisonment "for a minimum term of not less than one (1) year and a maximum term of not more than six (6) years" for the conviction for Conspiracy to Commit Robbery, and "for a minimum term of not less than two (2) years and a maximum term of not more than fifteen (15) years" for the Robbery conviction. (*Id.* at 3.)  Gonzales confirmed he was not "promised or guaranteed any particular sentence by anyone" and he understood his sentence would be determined by the Court "within the limits prescribed by statute." (*Id.* at 4.)  The State retained "the right to argue at sentencing." (*Id.* at 2.)  The plea agreement states that, under certain

conditions, the State could argue for punishment above the statutory maximum sentences, as a Habitual Criminal:[3]

> I understand and agree that, if I fail to interview with the Department of Parole and Probation, fail to appear at any subsequent hearings in this case, **or an independent magistrate, by affidavit review, confirms probable cause against me for new criminal charges** including reckless driving or DUI, but excluding minor traffic violations, **that the State will have the unqualified right to argue** for any legal sentence and term of confinement allowable for the crime(s) to which I am pleading guilty, including the use of any prior convictions I may have **to increase my sentence as an habitual criminal** to five (5) to twenty (20) years, life without the possibility of parole, life with the possibility of parole after ten (10) years, or a definite twenty-five (25) year term with the possibility of parole after ten (10) years.

> Otherwise I am entitled to receive the benefits of these negotiations as stated in this plea agreement.

(ECF No. 14-4 at 2–3.)

At the change-of-plea hearing, the parties discussed the need to canvass Gonzales about the possibility that the State might argue for punishment as a Large Habitual Criminal:

> THE COURT:  Could you state negotiations for the record, please?
>
> [DEFENSE COUNSEL]:  Yes, Your Honor.  My client today is going to plead guilty to conspiracy to commit robbery and robbery as charged in the Amended Criminal—or Amended Information, rather. The State has retained the right to argue at sentencing.
>
> [THE STATE]:  Judge, that—that includes for a large habitual treatment as well.
>
> [DEFENSE COUNSEL]:  That's what I was just going to say.  And we were going to ask the Court to also canvass him as to his eligibility or possible [sic] that the fact—the State may possibly seek major habitual criminal treatment.
>
> THE COURT: Now that's not articulated—let's be clear here.  That's not articulated in the Guilty Plea Agreement, although it's commonly done so as a component of negotiations if certain aspects or vision—certain things aren't accomplished.
>
> . . . .
>
> THE COURT:  Now, your lawyer and the [prosecutor] have just made reference to the fact that there is a possible exposure under habitual criminal which could

---

[3] At the relevant time, Nev. Rev. Stat. § 207.010(1)(b) stated, in relevant part, that a person convicted of any felony in Nevada who was previously thrice convicted, "whether in this State or elsewhere, of any crime which under the laws of the situs of the crime or of this State would amount to a felony is a habitual criminal and shall be punished" by imprisonment in the state prison "(1) For life without the possibility of parole; (2) For life with the possibility of parole, with eligibility for parole beginning when a minimum of 10 years has been served; or (3) For a definite term of 25 years, with eligibility for parole beginning when a minimum of 10 years has been served." Nev. Rev. Stat. § 207.010(1)(b), *as amended by* Laws 2009, c. 156, § 1.

carry—and as outlined on pages 1 and 2 of the Guilty Plea Agreement, a possible five to twenty years if it's treated under the small theory; life without the possibility of parole, life with the possibility of parole after ten years or a definite 25 on the top. So on the top range you're looking at a potential life without, a possible life with, or 25—definite term of 25 on the bottom of that life, that large habitual enhancement range is a ten years. It doesn't matter what the top might be. And although it's not articulated specifically in the Guilty Plea Agreement, my sense is that there's a potential there should you violate certain presentence release requirements, i.e., stay out of trouble, maintaining contact with law enforcement and meet the obligations that you must as a component of this agreement. Is that clear to you?

THE DEFENDANT: I understand, Your Honor.

(ECF No. 33-23 at 3–7.)

**b.    Magistrate's Determination and Indictment for Murder Case**

On January 5, 2014, while released from custody for the robbery and stolen vehicle cases, Gonzales was arrested without a warrant for, *inter alia*, First-Degree Murder. (ECF Nos. 33-23 at 9–11; 34-2 at 36.) On January 16, 2014, the State filed with the state justice court a Criminal Complaint and Probable Cause Arrest Documents charging Gonzales with, among other things, First-Degree Murder. (*Id.*) The state justice court magistrate found probable cause, and Gonzales was arraigned on the charges the next day. (*Id.*) On January 24, 2014, the State filed in the robbery case, a Notice of Intent to Seek Punishment as a Habitual Criminal. (ECF No. 33-24.) On January 31, 2014, a Grand Jury issued an Indictment against Gonzales for Murder with Use of a Deadly Weapon, Discharging a Firearm at or into an Occupied Structure, Possession of a Firearm by a Prohibited Person, and three counts of Child Abuse, Neglect, or Endangerment, in connection with the fatal shooting of Eric Montoya inside his residence. (ECF No. 33-25.) On February 4, 2014, the State dismissed the Complaint for the murder charges as it was superseded by the Grand Jury Indictment. (ECF No. 34-2 at 36.) Gonzales's counsel withdrew due to potential conflicts of interest and new counsel was appointed to represent Gonzales. (ECF No. 33-27 at 3–6.)

**c.    Motion to Strike Habitual-Criminal Notice in Robbery Case**

Through new counsel, Gonzales filed a Motion to Strike the State's Notice of Intent to Seek Punishment as a Habitual Criminal ("motion to strike"). (ECF No. 34-2.) He argued the plea agreement did not authorize the State to seek Habitual Criminal punishment based on a Grand Jury Indictment. (*Id.* at 7–9.) He argued that, although a magistrate found probable cause to arrest

Gonzales based on the filing of a Complaint for the new criminal charges, the filing of the Complaint did not require the magistrate to find probable cause against Gonzales for the new charges. (*Id.*)  The State filed an Opposition to Defendant's Motion to Strike Criminal Habitual Treatment/Sentencing Memorandum but did not address Gonzales's argument that the State was not authorized to seek punishment as a Habitual Criminal under the terms of the plea agreement due to the failure of a magistrate to make a probable cause determination. (ECF No. 34-7.)

At the hearing on the motion to strike, the defense argued the State, as the author of the plea agreement, did not allow for a Grand Jury Indictment instead of a magistrate's determination; the State argued the court has discretion to consider new charges acquired after a defendant signs a Guilty Plea Agreement; and the state district court ruled the defense received adequate notice of the State's intention to use the new charges and denied a verbal motion to stay sentencing so the defense could file an interlocutory petition on the issue:

> [DEFENSE COUNSEL]:  [T]he State has the opportunity to present and articulate the very specific terms of that agreement, the very specific terms and this had to do with the findings by an independent magistrate review, not by a Grand Jury.  And there is a huge difference between a Grand Jury and an independent magistrate review in reference to this.  This they elected to proceed through Grand Jury Indictment not through—
>
> THE COURT:  You mean on the subsequent murder allegation.
>
> [DEFENSE COUNSEL]:  That's correct.
>
> THE COURT:  Okay.
>
> [DEFENSE COUNSEL]:  That's correct.  And that's what generated the filing of the notice of intent—
>
> THE COURT:  Okay.
>
> [DEFENSE COUNSEL]:  —to seek the habitual criminal charge.  And that is a difference which has [a] huge distinction between the manner in which it proceeds and who presents the evidence and what is reviewed and the—and because it's a Grand Jury as opposed to an independent magistrate review, I just—in this case it would be inappropriate.  It's not necessary, not appropriate and if you find that it even—you can even consider it, then Your Honor's discretion should eliminate the prior two stale and nonviolent felonies.
>
> THE COURT:  All right. [Prosecutor], State's response.
>
> [THE STATE]:  Judge, every day in this courtroom—I'm going to take part of the arguments back.  Every day in this courtroom we come before you when people commit new offenses after they've signed a Guilty Plea Agreement and we ask you

to consider the new offenses.  This is nothing new except for the media and everybody else that's sitting here.  Otherwise, every single day in this courtroom in front of you, we ask you to do it and you consider it.  I understand that it's a high[-] profile case and I also understand that the defendant not only committed a murder but he also committed a burglary as well as a possession of firearm, because there's actually two cases that I'm going to ask you to consider.  I don't think that's anything new and I don't think that's anything different.

These GPAs, I agree with the Court, are not contracts of adhesions.  We've done this for a long time.  You've done this for a long time.  This is not anything unusual and so I'm going to ask you to consider the two new arrests.

. . . .

In regard to the criminal habitual treatment, I'm going to—I understand and I think [defense counsel] said it's discretionary.  But this defendant based on the things that he has done, the State feels that he is an appropriate candidate for this type of treatment.  It's discretionary with this Court, we understand that.

. . . .

But at the end of the day, this is not anything unusual.  This is done every single day in this courthouse by Your Honor and other judges.  It's discretionary.  We're asking you to use your discretion to sentence him under that statute and with that I'll submit it.

THE COURT:  Well, this is just—right now we're talking about a motion to strike.  We're not talking—we're not on a sentencing hearing.

[THE STATE]:  Correct.

THE COURT:  We're just saying—

[THE STATE]:  Correct.

THE COURT:  —procedurally, should I strike your notice.  [Defense counsel], this is your motion; final word.

[DEFENSE COUNSEL]:  The Court grasps it.  It's—in order to challenge the constitutionality and application by the Court, I think we've made the record in reference to that.

THE COURT:  All right.  It's a discretionary call under 207.010.  Under Nevada law I think the State has properly placed Mr. Gonzales' Counsel on notice.  I think it was a component that was considered as a function of the first instance and we're going to talk about that as a component of the motion to withdraw the plea.  I'm going to deny the motion to strike the intent to seek habitual criminal because I believe—and the sentencing memorandum because I believe Nevada law allows me to exercise that discretion and frankly both sides are in agreement that that's a discretion of the sentencing court.

We're moving now to the defendant's motion to withdraw the guilty plea.  [Defense counsel], this is your motion.

[DEFENSE COUNSEL]:  Your Honor, based upon the findings, rather than proceed to sentencing at this time I'd ask for a stay so I can do an interlocutory appeal on the matter in reference to the habitual criminal.

///

9

THE COURT:  All right. I'm going to deny your motion for an interlocutory on the grounds—on the motion to seek—to strike but we're going to talk about it maybe more as a component of where I move when we head towards the sentencing component. I may because I got questions I've got to ask or I want answered, okay, and how this is—how we're—what I'm going to consider as a function of the evidence in support of sentence.  So I'm not saying no but I don't think there's grounds to stay on a denial of that motion to strike at this point, so.

(ECF No. 34-12 at 4–10.)[4]  At that same hearing, but during argument concerning a different motion, the State acknowledged it could not seek punishment as a Habitual Criminal except under the conditions set forth in the written plea agreement:

[THE STATE]:  [T]hat's what I intend to do because the Guilty Plea Agreement is clear; right?  If a[n] independent—

. . . .

I'm just saying that to me the violation of the Guilty Plea Agreement which is what he signed, not the adhesion contract that [defense counsel] was talking about but the Guilty Plea Agreement that he signed specifically references that **if the defendant doesn't do certain things; he doesn't show up to P and P, he doesn't be [sic] interviewed, he fails to stay out of trouble, and specifically it talks about an independent magistrate by an affidavit review finds that the defendant essentially has not stayed out of troubled [sic], the State retains the right to argue.**

So to me what that means is that if we bring new charges against the defendant, meaning the murder case, that's what I have to show this Court.  That the defendant failed to stay out of trouble and this is the new charges that he picked up.  That's what I'm saying to the Court.

THE COURT: Okay.

[THE STATE]:  It's my understanding of the Guilty Plea Agreement and how we've always operated with the Guilty Plea Agreement just looking at the four corners of that agreement.  Whether the State decides to bring in other evidence, I obviously will think about that but in regard to the murder case, that's why I'm looking to that agreement.  That gives me guidance as to what I need to show in order for me to retain the right to argue in order also for me to ask for the large habitual.

(ECF No. 34-12 at 31–34.)

### d.    Petition for Writ of Mandamus or Prohibition

On August 11, 2014, Gonzales filed in the Supreme Court of Nevada an interlocutory

---

[4] Gonzales's Motion to Withdraw Guilty Plea was based on his claims that he intended to plead to only one count, i.e., Conspiracy to Commit Robbery; he was not released as promised on the day he entered his guilty pleas, his counsel did not spend adequate time with him to review the agreement so that it would be correct and did not correct the plea before the State filed the Notice of Intent to Seek Punishment as a Habitual Criminal. (ECF Nos. 34-6; 34-12 at 9–18.)  In that motion, Gonzales did not argue he was entitled to withdraw the guilty pleas because a magistrate did not find, based on affidavit review, there was probable cause to believe Gonzales committed the murder charges. (*Id.*)

Petition for Writ of Mandamus, or in the Alternative, a Writ of Prohibition and Emergency Motion for Stay of Proceedings ("interlocutory petition"). (ECF No. 34-15.)  The interlocutory petition claimed, among other things, that the State's Notice of Intent to Seek Punishment as a Habitual Criminal constitutes a breach of the plea agreement because the State obtained the murder charges against Gonzales based on a Grand Jury Indictment. (*Id.* at 5–7.)  He claimed the plea agreement only authorized the State to seek punishment as a Habitual Criminal if an independent magistrate, by affidavit review confirms probable cause against Gonzales for a new criminal charge. (*Id.*)  He argued that the filing of a Complaint in Justice Court does not require a finding of probable cause and based his argument on two Nevada statutes concerning Complaints:

> NRS 171.102.  Complaint defined; oath or declaration required. The complaint is a written statement of the essential facts constituting the public offense charged.  It must be made upon: 1. Oath before a magistrate or a notary public; or 2. Declaration which is made subject to the penalty for perjury.

> NRS 171.106:  Issuance of warrant or summons upon complaint or citation. If it appears from the complaint or a citation issued pursuant to NRS 484A.730, 488.920 or 501.386, or from an affidavit or affidavits filed with the complaint or citation that there is probable cause to believe that an offense, triable within the county, has been committed and that the defendant has committed it, a warrant for the arrest of the defendant shall be issued by the magistrate to any peace officer. Upon the request of the district attorney a summons instead of a warrant shall issue. More than one warrant or summons may issue on the same complaint or citation. If a defendant fails to appear in response to the summons, a warrant shall issue.

(ECF No. 34-15 at 5–7.)  Gonzales argued the Justice Court docket "shows only a 48 probable cause review" and "a probable cause for arrest finding for 'probable cause arrest documents,'" and that neither that probable cause review, nor the filing of the Complaint, triggered the State's authority to seek a sentence as a Habitual Criminal under the terms of the plea agreement. (*Id.*) The Supreme Court of Nevada declined to exercise discretion to consider the petition because the claims concerned sentencing matters that could later be challenged on appeal. (ECF No. 34-17.)

### 2.    Applicable Legal Principles

A defendant has a due process right to enforce the terms of his plea agreement. *Santobello v. New York*, 404 U.S. 257, 261–62 (1971).  "When a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." *Id.* at 262.  A due process violation occurs if the

State breaches the plea agreement, whether or not it had any effect on the defendant's sentence. *United States v. Mondragon*, 228 F.3d 978, 981 (9th Cir. 2000) ("The harmless error rule does not apply when the government breaches a plea agreement.").

Plea agreements "amount to, and should be interpreted as, a contract under state contract law." *Ricketts v. Adamson*, 483 U.S. 1, 5 n.3 (1987) ("[T]he construction of [a] plea agreement and the concomitant obligations flowing therefrom are, within broad bounds of reasonableness, matters of state law."). In Nevada, "[w]hen the State enters into a plea agreement, it is held to the most meticulous standards of both promise and performance with respect to both the terms and the spirit of the plea bargain." *Sparks v. State*, 121 Nev. 107, 110, 121 P.3d 486, 487 (2005) (internal quotation marks omitted).

A court "initially determines whether the language of the contract is clear and unambiguous; if it is, the contract will be enforced as written." *Am. First Fed. Credit Union v. Soro,* 131 Nev. 737, 739, 359 P.3d 105, 106 (2015) (quoting *Davis v. Beling,* 128 Nev. 301, 321, 278 P.3d 501, 515 (2012)). As a defendant's liberty is at stake, the government is ordinarily held to the literal terms of the plea agreement it made, *United States v. Packwood*, 848 F.2d 1009, 1012 (9th Cir. 1988), so that "[t]he government gets what it bargains for but nothing more." *United States v. Transfiguracion*, 442 F.3d 1222, 1228 (9th Cir. 2006) (citing *United States v. Pruitt*, 32 F.3d 431, 433 (9th Cir. 1994)). As the government is usually the drafter, it must ordinarily bear the "responsibility for any lack of clarity." *United States v. Franco-Lopez*, 312 F.3d 984, 989 (9th Cir. 2002) (internal quotation marks omitted) (stating that ambiguities in a plea agreement are construed "in favor of the defendant."); *see also United States v. De la Fuente*, 8 F.3d 1333, 1338 (9th Cir. 1993) ("Construing ambiguities in favor of the defendant makes sense in light of the parties' respective bargaining power and expertise.").

"A contract is ambiguous if its terms may reasonably be interpreted in more than one way . . . but ambiguity does not arise simply because the parties disagree on how to interpret their contract." *Galardi v. Naples Polaris, LLC,* 129 Nev. 306, 309, 301 P.3d 364, 366 (2013) (internal citation omitted). In particular, an interpretation is not reasonable if it makes any contract provisions meaningless, or if it leads to an absurd result. *See Washoe Cty. Sch. Dist. v. White,* 133

Nev. 301, 305, 396 P.3d 834, 839 (2017); *Nevada State Educ. Ass'n v. Clark Cnty. Educ. Ass'n*, 137 Nev. 76, 83–84, 482 P.3d 665, 673 (2021).

Under Nevada law, "magistrate" includes justices of the peace, municipal judges, and "[o]thers upon whom are conferred by law the powers of a justice of the peace in criminal cases." Nev. Rev. Stat. § 169.095. When an officer in Nevada arrests an individual without a warrant, he must take that person to the nearest available magistrate and a Complaint must be filed "forthwith:"

> 1. Except as otherwise provided in subsections 5 and 6, **a peace officer making an arrest under a warrant issued upon a complaint or without a warrant shall take the arrested person without unnecessary delay before the magistrate who issued the warrant or the nearest available magistrate** empowered to commit persons charged with offenses against the laws of the State of Nevada.
>
> . . . .
>
> 3. If an arrested person is not brought before a magistrate within 72 hours after arrest, excluding nonjudicial days, the magistrate:
>
> > (a) Shall give the prosecuting attorney an opportunity to explain the circumstances leading to the delay; and
>
> > (b) May release the arrested person if the magistrate determines that the person was not brought before a magistrate without unnecessary delay.
>
> 4. **When a person arrested without a warrant is brought before a magistrate, a complaint must be filed forthwith.**

Nev. Rev. Stat. § 171.178.

According to the Supreme Court, suspects arrested without a warrant, must be given "a judicial determination of probable cause within 48 hours of arrest." *See Cnty. of Riverside v. McLaughlin*, 500 U.S. 44 (1991); *see also* Nev. Rev. Stat. § 171.106 *as enacted by* Laws 1971, p. 830 (a warrant or summons may issue "[i]**f it appears from the complaint or a citation** issued pursuant to NRS 484A.730, 488.920 or 501.386, **or from an affidavit or affidavits filed with the complaint or citation that there is probable cause to believe that an offense, triable within the county, has been committed a**nd **that the defendant has committed it** . . . ."); *Woerner v. Just. Ct. of Reno Twp. ex rel. Cnty. of Washoe*, 116 Nev. 518, 524, 1 P.3d 377, 380 (2000).

In Nevada, a complaint is defined as "[a] written statement of the essential facts constituting the public offense charged" and must be made upon (1) oath before a magistrate or a

notary public; or (2) declaration which is made subject to the penalty for perjury. Nev. Rev. Stat. § 171.102. According to Nev. Rev. Stat. § 53.045, a court may consider unsworn written declarations in lieu of an affidavit, where the declaration recites that its statements are true and correct and is signed by the declarant under the penalty of perjury. A declaration that complies with § 53.045 can satisfy a separate statute's affidavit requirement. *See Buckwalter v. Dist. Ct.*, 126 Nev. 200, 202, 234 P.3d 920, 922 (2010) (reading Nev. Rev. Stat. § 41A.071 and Nev. Rev. Stat. § 53.045 harmoniously and holding that, while § 41A.071 "imposes an affidavit requirement," a litigant can meet that requirement "either by sworn affidavit or unsworn declaration made under penalty of perjury" that complies with § 53.045); *State, Dep't of Motor Vehicles v. Bremer,* 113 Nev. 805, 811–13, 942 P.2d 145, 149–50 (1997) (concluding in an administrative matter that an unsworn declaration that complied with § 53.045 satisfied a statute requiring affidavits from persons who had conducted breath analyzer tests).

### 3.    State Court Determination

The Nevada Court of Appeals determined the qualifying clause of the plea agreement concerning an independent magistrate's determination of probable cause by affidavit review for new charges against Gonzales, "never came into play" because the express terms of the plea agreement and the district court plea canvass evince the parties contemplated the State retained an unqualified right to argue for Habitual Criminal treatment at sentencing:

> [G]onzales and the State entered into a written plea agreement whereby the State retained the right to argue at sentencing. But, the document also contained an apparent boilerplate or stock paragraph stating that the State could argue for habitual treatment if "an independent magistrate, by affidavit review, confirms probable cause against [Gonzales] for new criminal charges." After both parties signed the written plea agreement, the district court verbally canvassed Gonzales regarding his plea of guilty. During the district court's canvass of Gonzales, Gonzales' attorney acknowledged that the State retained the right to argue at sentencing, including arguing for habitual treatment. The district court, thereafter, discussed with Gonzales the consequences and penalties involved if the court sentenced him under the habitual criminal statute. The court also warned Gonzales that the State might seek habitual treatment at sentencing if Gonzales engaged in further misconduct or failed to cooperate with law enforcement upon his release from custody after his plea of guilty. Gonzales indicated that he understood habitual treatment was a possibility as a result of his guilty plea. In open court immediately after his plea, the district court ordered an own recognizance release of Gonzales pursuant to the terms of the guilty plea agreement.
>
> . . . .

A little less than a month after his release from custody, Gonzales was arrested for murder

> [FN2] Gonzales allegedly shot through the front door of a home, hitting and killing the occupant.

and indicted by the Clark County Grand Jury.  The State filed a notice of intent to seek punishment as a habitual criminal in the present case, alleging that Gonzales had four prior felony convictions that occurred from 1999 to 2002.  Gonzales moved to strike the notice of intent to seek habitual criminal treatment, arguing the prior convictions were stale and the State could only seek habitual treatment if an independent magistrate, by affidavit review, confirmed probable cause against him for new criminal charges.  Gonzales also moved to withdraw his guilty plea.  Without conducting an evidentiary hearing, the district court denied both motions.

> [FN 3] We note that after the district court made its ruling, the Nevada Supreme Court issued *Stevenson v. State*, 131 Nev. ___, ___, 354 P.3d 1277, 1281 (2015), clarifying the standards for determining whether a defendant is entitled to withdraw his guilty plea.

At sentencing the district court adjudicated Gonzales a habitual criminal based upon his prior felony convictions and thereafter sentenced Gonzales pursuant to the habitual criminal statute to life without the possibility of parole.

> [FN 4] The record reflects the district court did not rely on the pending murder charges in adjudicating Gonzales a habitual criminal.  Further, the district court could consider evidence of the murder charges in crafting the sentence.  *See* NRS 176.015(6) (the district court may consider "any reliable and relevant evidence at the time of sentencing").

. . . .

[G]onzales further argues the district court erred in not striking the notice of intent to seek punishment under the habitual criminal statute because permitting the State to argue for habitual criminal treatment at sentencing violated the terms of the plea agreement.  Specifically, Gonzales argues that because an independent magistrate did not confirm probable cause against him for new criminal charges *by affidavit review*, the clause in the guilty plea agreement permitting the State to seek habitual criminal treatment based on new criminal charges never came into play.

In the proceedings below, Gonzales argued this to the district court and the State countered that the district court had the discretion to sentence Gonzales under the habitual criminal statute because of his prior felonies and also in considering the new criminal charges.  The State failed to address Gonzales' argument as to breach of the plea agreement.  The district court, relying on its discretion to adjudicate Gonzales under NRS 207.010, denied Gonzales' motion to strike without addressing Gonzales' objection that no independent magistrate found probable cause against him *by affidavit review*.

Guilty plea agreements are subject to general contract principles. *State v. Crockett*, 110 Nev. 838, 842, 877 P.2d 1077, 1079 (1994).  Prosecutors are held to "meticulous standards of both promise and performance." *Kluttz v. Warden, Nevada State Prison*, 99 Nev. 681, 683, 669 P.2d 244, 245 (1983).  If the prosecutor violates either the terms or the spirit of the plea bargain, reversal may be warranted. *See id,* at 684, 669 P.2d at 245–46.

Although the district court never specifically addressed this argument, upon our review of the record in this case, we agree with Gonzales that based on the boilerplate language of the plea agreement, no independent magistrate found probable cause against him by *affidavit review*.

[FN 6] And, although the parties did not argue that the district court judge was a magistrate, *see* NRS 172.285, we note nothing in the record shows that the district court judge who considered the indictment upon presentment ever reviewed anything by affidavit or even by transcript. Moreover, this statute only requires a court to look at the form of the indictment as to whether the charge constitutes a public offense; the court does not examine the character or sufficiency of the evidence offered in support of the indictment to determine probable cause (which would not be possible until a transcript of proceedings was prepared).

However, we conclude that ultimately the State did not breach the plea agreement by arguing for habitual criminal treatment because the record clearly demonstrates that the State was free to seek habitual criminal treatment without having to rely on the challenged clause. Pursuant to the express terms of the plea agreement, the State retained the right to argue at sentencing. No limitation was placed on the State's right to argue at sentencing in the written plea agreement, and both parties clarified to the district court during the plea canvass that the State's right to argue at sentencing included the right to argue for large habitual criminal treatment.

[FN 7] At the plea canvass, defense counsel stated Gonzales "is going to plead guilty" and noted "[t]he State has retained the right to argue at sentencing." The prosecutor immediately intervened, clarifying "Judge, that—that includes for a large habitual treatment as well," after which defense counsel acknowledged "*[t]hat's what I was just going to say*. And we were going to ask the Court to also canvass him as to his eligibility or possible [sic] that the fact—*the State may possibly seek major habitual criminal treatment*." (Emphasis added).

To the extent Gonzales implies he always understood the stock language in the written plea agreement as creating a contingency, this argument is without merit. *See Rouse v. State*, 91 Nev. 677, 678–79, 541 P.2d 643, 644 (1975) (holding where defendant enters a plea agreement in open court, his subjective understanding of the likely sentence, where unsupported by the record, does not invalidate his plea).

Because the express terms of the plea agreement and the district court plea canvass evince that both parties clearly contemplated the State retained the right to argue at sentencing, including habitual criminal treatment, the provision in the boilerplate language never came into play. Accordingly, we conclude the district court did not err in denying Gonzales' motion to strike the State's notice to seek habitual criminal status.

(ECF No. 14-9 at 2–8.)

The concurring opinion of one judge for the Nevada Court of Appeals states that Gonzales breached the plea agreement, thereby freeing the State to seek a sentence as a Habitual Criminal,

because under Nevada law, a district court judge is a magistrate, and its statutory review of sworn Grand Jury testimony constitutes an "affidavit review" within the meaning of the plea agreement:

> I depart from my colleagues on two points. After Gonzales entered his plea in this case, he was indicted for the crime of murder in a separate case, and the district judge found that this constituted a breach of certain conditions of the plea agreement. Gonzales argues that no breach occurred because, despite having been indicted, no "independent magistrate" found probable cause for the subsequent murder charge based upon an "affidavit review" as required by the plea agreement.
>
> Gonzales' argument is premised upon the contention that a grand jury is not a "magistrate" within the meaning of NRS 169.095, and its issuance of an indictment is not an "affidavit review." Those two contentions are certainly true, but they miss the point. When a grand jury issues a true bill finding probable cause, the grand jury's work does not merely float into the sky and magically land upon the defendant and fly him back to court. Instead, NRS 172.285 requires that after the grand jury issues any true bill, the merits of the true bill must be reviewed by two district judges (a district judge being a "magistrate" under NRS 169.095: "Magistrate" means . . . Judges of the district courts) before an arrest warrant may be issued and before the defendant may be held to answer the charges:
>
> NRS 172.285 Warrant on presentment.
>
> 1. If the court deems that the facts stated in a presentment constitute a public offense triable:
>
>    (a) In the district court of the county, it shall direct the clerk to issue a warrant for the arrest of the defendant.
>
>    (b) In another court of the county, it shall forward the presentment to such court.
>
> 2. The clerk, or justice of the peace in a case forwarded to the justice of the peace, may accordingly at any time thereafter issue a warrant under the signature and seal of the court, if it has a seal.
>
> 3. The magistrate before whom the defendant is brought shall proceed to examine the charge contained in the presentment and hold the defendant to answer such charge, or discharge the defendant, in the same manner as upon a warrant of arrest on complaint.
>
> Thus, the grand jury's work is reviewed by one magistrate before an arrest warrant issues, and then reviewed again by another magistrate before the defendant may be held to answer the charges. Accordingly, the proper analysis here is not that the grand jury constitutes a "magistrate," it's that the "magistrate" is one of the two district judges who review and approve the grand jury's findings before the defendant can be charged.
>
> Furthermore, a grand jury may only base a true bill upon evidence that would be admissible in court, meaning in most instances the sworn testimony of live witnesses brought before the grand jury. NRS 172.135 ("The grand jury can

receive none but legal evidence, and the best evidence in degree"). Since an "affidavit" is defined by Blacks' Law Dictionary simply as the statement of a witness made under oath, I'm having trouble seeing why a district judge's review of sworn grand jury testimony "in the same manner as upon a warrant of arrest on complaint" does not constitute an "affidavit review" within the meaning of the plea agreement. Consequently, I would agree with the district court that a breach of the express terms of the plea agreement occurred when Gonzales was indicted for murder, thereby freeing the State to seek a harsher sentence than it previously agreed to and permitting the district court to sentence Gonzales as a habitual offender.

(ECF No. 14-9 at 12–13.)

### 4.    Analysis of Ground I

#### a.    The State Appellate Court's Determination is Based on an Unreasonable Determination of Fact.

The state appellate court's determination that "no limitation was placed on the State's right to argue at sentencing in the written plea agreement," and "the record clearly demonstrates that the State was free to seek habitual criminal treatment without having to rely on the challenged clause," (ECF No. 14-9 at 7–8) is objectively unreasonable. 28 U.S.C. § 2254(d)(2); *see, e.g., Brumfield v. Cain*, 576 U.S. 305, 314 (2015) (holding the record before the state court compelled the conclusion that its critical factual determinations were unreasonable). There is clear and convincing evidence in the state court record of proceedings that demonstrates the state appellate court's determination is contradicted by the express language of the plea agreement, the plea canvass, and even the State prosecutor's stated understanding of the plea agreement.

The plea agreement unequivocally states the State could argue for a sentence as an "habitual criminal" upon the occurrence of certain preconditions set forth in a single paragraph of that plea agreement. (ECF No. 14-4 at 2–3.) One condition is if "an independent magistrate, by affidavit review, confirms probable cause against [Gonzales] for new criminal charges, including reckless driving or DUI, but excluding minor traffic violations . . . ." (*Id.* at 2.) Although there is a term in the plea agreement stating that the State retained the "right to argue at sentencing," that sentence says nothing about the State's right to argue at sentencing for punishment as a Habitual Criminal. (*Id.* at 2.) During a later hearing on a third-party motion for public access to certain redacted documents filed in the case, the State prosecutor acknowledged the State could only seek punishment as a Habitual Criminal under the conditional clause in the plea agreement: "the Guilty

Plea Agreement that he signed specifically references that if the defendant doesn't do certain things . . . he fails to stay out of trouble, and specifically it talks about an independent magistrate by an affidavit review finds that the defendant essentially has not stayed out of troubled [sic], the State retains the right to argue." (ECF No. 34-12 at 31–34); *see, e.g., Khan v. Bakhsh,* 129 Nev. 554, 558, 306 P.3d 411, 413–14 (2013) (holding the parol evidence rule generally bars extrinsic evidence regarding prior or contemporaneous agreements that are contrary to the terms of an integrated contract).

The state appellate court's determination is also objectively unreasonable because it renders irrelevant the entire paragraph of the plea agreement that sets forth the conditions under which the parties agreed that the State had a right to seek punishment as a Habitual Criminal. *See Rd. & Highway Builders v. N. Nev. Rebar*, 128 Nev. 384, 390, 284 P.3d 377, 380 (2012) (providing that contracts must be read as a whole to avoid negating any provision). Had the parties intended for the State to retain an unqualified right to seek punishment as a Habitual Criminal, the State, as the drafter of the plea agreement, could have omitted the conditional paragraph or inserted a written provision into the plea agreement clarifying that, notwithstanding the conditional paragraph, the parties intended the State had such an unqualified right. The parties did neither.

The state appellate court furthermore unreasonably determined that "the express terms" of the "district court plea canvass evince that both parties clearly contemplated the State retained the right to argue at sentencing, including habitual criminal treatment," such that the conditional paragraph in the plea agreement "never came into play." (ECF No. 14-9 at 8.) At the change-of-plea hearing, the prosecutor alerted the state district court that the State had the right to argue "for a large habitual criminal" sentence, but did not say the State had an unqualified right to do so. Defense counsel agreed it was a possibility and explained that the parties "were going to ask the Court to also canvass [Gonzales] as to his eligibility or possible [sic] that the fact—the State may possibly seek major habitual criminal treatment." (ECF No. 33-23 at 3–4.) The state district court noted to Gonzales that "the [prosecutor]" and "[defense counsel]," "have just made reference to the fact that there is a **possible** exposure under habitual criminal . . . ." (*Id.* at 6) (emphasis added). No one stated the conditions for the State's authority to seek punishment as a Habitual Criminal

that are set forth in the executed plea agreement, were either stricken, amended, or modified. And no one stated that the State's right to seek such punishment was unqualified and not subject to the conditions set forth in the written plea agreement.

The remarks of defense counsel and the state district court that it was "possible," that the State would argue for punishment as a Habitual Criminal are consistent with the conditional nature of the State's right to seek Habitual Criminal sentence, as set forth in the written plea agreement. Nothing in the change-of-plea canvass put Gonzales on notice, or obtained his agreement, to modify the conditions that he agreed to as set forth in the plea agreement. Based on this record, all objectively reasonable jurists would be compelled to conclude that the plea agreement entitled the State "the right to argue" for a sentence within the minimum and maximum sentences allowed under the statutes for the crimes to which Gonzales pleaded guilty *unless* certain conditions as set forth in that plea agreement triggered the State's right to seek punishment over the statutory maximum as a Habitual Criminal.

The state appellate court's determination that the plea agreement gave the State the unqualified right to argue for punishment as a Habitual Criminal is an objectively unreasonable determination of fact in light of the evidence presented in the state court proceedings. 28 U.S.C. § 2254(d)(2). Accordingly, Gonzales is entitled to *de novo* review of this claim. *See Hurles v. Ryan*, 752 F.3d 768, 778 (9th Cir. 2014) ("If we determine, considering only the evidence before the state court, that . . . the state court's decision was based on an unreasonable determination of the facts, we evaluate the claim de novo.").

### b. *De Novo* Review of Ground I

The Court finds, on *de novo* review, that Gonzales is not entitled to federal habeas relief because a magistrate decided, based on affidavit review, that there was probable cause to believe Gonzales had committed eligible crimes after the entry of his guilty pleas, and therefore the State did not breach the plea agreement when it sought punishment as a Habitual Criminal.

The state-court record includes a submission by defense counsel of the Register of Actions ("Register") for the state justice court in the murder case. (ECF No. 34-2 at 36.) That Register shows that Gonzales was arrested for the murder charges after he entered his guilty plea but before

he was sentenced for the robbery case. (ECF Nos. 33-23 at 3–7; 34-2 at 36; 35-1.)  The Register demonstrates that a magistrate as defined under Nev. Rev. Stat. § 169.095, "found" "probable cause," to believe Gonzales committed, among other things, First-Degree Murder, when it conducted its 48-hour review of the Probable Cause Arrest Documents, under *McLaughlin*, 500 U.S. 44. (ECF No. 34-2 at 36); *see also supra* at pp. 13–14.

The determination that the magistrate found probable cause to believe Gonzales committed First-Degree Murder based on affidavit review is furthermore supported by the affidavits contained in the Complaint (ECF No. 65-2) and the Probable Cause Arrest Documents (ECF No 65-3) submitted to the state justice court. (ECF Nos. 34-2 at 36;  65-2 at 7; 65-3 at 3); *see also supra* at pp. 13–14.  Even if the documents (ECF No. 65-2 and 65-3), although filed in the state justice court, are considered not part of the state-court record for deferential-review, this Court may consider them for purposes of its *de novo* review of the claim.  *See Benson v. Chappell*, 958 F.3d 801, 824 (9th Cir. 2020) ("We have held that *Pinholster* prohibits consideration of new evidence only "for the purpose of determining whether the last reasoned state court decision was contrary to or an unreasonable application of clearly established law or an unreasonable determination of the facts.") (citing *Crittenden v. Chappell*, 804 F.3d 998, 1010 (9th Cir. 2015)).[5]

The Court finds on de novo review that the state-court record demonstrates the requisite magistrate's determination of probable cause to believe that Gonzales committed a new qualifying offense of First-Degree Murder, was accomplished on January 16, 2014. (ECF Nos. 34-2 at 36; 65-2; 65-3.)  Moreover, the State filed its Notice of Intent to Seek Punishment as a Habitual Criminal on January 24, 2014, and the Grand Jury Indictment for the murder charges was not handed down until a week later on January 31, 2014. (ECF Nos. 34-2 at 36; 33-24; 33-25.)  Thus, it was the magistrate's determination of probable cause, and not the Grand Jury Indictment, that precipitated the Notice of Intent to Seek Punishment as a Habitual Criminal.  Because it appears from the state-court record that the condition precedent to the State's unqualified right to seek

---

[5] Gonzales admits the correctness of those documents (ECF No. 66) and neither party objects to the Court's consideration of those documents for *de novo* review of Ground I.

punishment as a Habitual Criminal was timely met, the State did not breach the plea agreement. Ground I is therefore denied.

### B.   Ground II—Consideration of Gang-Related Evidence at Sentencing

Gonzales alleges his rights to free association, due process, equal protection, and fair sentencing were violated when the sentencing court considered gang-related evidence, despite no evidence or allegations the convictions were gang-related. (ECF No. 27 at 12.) He claims evidence about street and prison gangs, and graphic photographs of injuries and weapons connected to gang-related violence, were not connected to Gonzales or his actions and the State failed to establish its relevance to the charges or the Habitual Criminal adjudication. (*Id.* at 14–16.)  He alleges the evidence and testimony was highly prejudicial and impermissible character evidence in violation of *Dawson v. Delaware*, 503 U.S. 159 (1992). (*Id.*)  Respondents counter that "sentencing courts have broad discretion to consider various kinds of information," and the gang-evidence had a nexus to the crimes and was relevant to Gonzales's violent criminal history and potential future dangerousness. (ECF No. 42 at 13–16.) For the reasons discussed below, the Court denies Ground II because the state appellate court reasonably determined the evidence was relevant to the sentencing court's determination of Gonzales's future dangerousness and informed the sentencing court's exercise of its discretion in determining the ultimate sentence among the available options. *Dawson*, 503 U.S. at 166–67.

#### 1.   Additional Background

##### a.   Testimony at Sentencing about Gangs

The defense objected to testimony at sentencing about gangs within Clark County and the Nevada prison system on the grounds that there was no gang-enhancement or gang-involvement alleged in this case, or in the pending murder case. (ECF No. 35-1 at 6, 35, 75.)  The State countered, "[w]hen you're sentencing somebody, taking into account their character, the people they associate with, their prior felony convictions are all things that are relevant that the Court needs to look at in order to sentence somebody, whatever the Court may decide to sentence that person to." (*Id.* at 35–36.)  The sentencing court overruled the objection stating, "U.S. Supreme Court has weighed in at *U.S v. Watts* saying that all this information is highly relevant, the

character, the conduct may be considered by a sentencing court as relevant, as a component of the efforts." (*Id.* at 36.)

Metro Detective Timothy Stovall of the Gang Unit, Intelligence Section, testified that, based on Field Interview Cards, Gonzales had associated himself with the 28th Street gang. (*Id.* at 75, 85.)  Stovall used a PowerPoint presentation (ECF Nos. 53-3 and 53-4) to illustrate a photograph of Gonzales, taken "within the last probably four years" in which he displays the 28th Street gang-hand sign and his Nevada 13 tattoo, while in the company of codefendant, Uceda. (*Id.* at 76–79.)  Stovall claimed Uceda is a high-ranking member of the 28th Street gang and is depicted (in the photograph with Gonzales) wearing tattoos of a 2 and an 8 for 28th Street and for its clique called Raskals. (*Id.* at 79, 81.)  Stovall identified photographs of Gonzales's tattoos, including a prominent XXV3 above his hairline on his forehead and said they signify his commitment to the 28th Street gang. (*Id.* at 84–85.)  Stovall opined Gonzales was a prominent gang member because he was photographed in a vehicle with Uceda who is "the top guy of 28th Street." (*Id.* at 85.) Stovall testified that 28th street gang members suffered prior felony convictions or were implicated in felonies such as murder, attempted murder, robbery, burglary, extortion, grand larceny auto, grand larceny drug trafficking, witness intimidation, and extortion. (*Id.* at 80–81.)

Stovall testified Uceda had committed an attempted murder with a firearm with a criminal gang enhancement (for promoting, furthering, assisting the 28th Street gang) by firing 3 to 4 shots and striking a rival-gang member in the shoulder. (*Id.* at 81.)  Stoval testified another member of the 28th Street gang, Vincent Domenech aka Half Dead, committed battery with a deadly weapon causing substantial bodily harm when he fired at a group of kids playing in a cul-de-sac, mistaking them for rival-gang members, and caused a young boy's partial paralysis for 7 months. (*Id.* at 81–82.)  Stoval said another member of the 28th Street gang, Eugene Otterness, who was out of the Raskals' clique, was convicted of robbery after he and others yelled racial slurs at a black male who was walking down the street and then surrounded him and stole his necklace and cell phone. (*Id.* at 82.)  Stoval testified these examples of violence were directed toward perceived gang members, but "a lot or most of the felonious conduct that occurs is not against other gangs or other gang members," but against members of the community. (*Id.* at 83.)

Metro corrections investigator Gabriel Munoz testified as an investigator for the Detention Gang Special Investigations Unit, that jail and prison gangs are extensions of street gangs. (*Id.* at 34–35, 40.)  Munoz presented a PowerPoint presentation (ECF Nos. 53-1 and 53-2) that included information about the activities of "Nevada Trece" or "Nevada 13," which is composed of the local street gangs in the Las Vegas area for the purpose of opposing California gangs. (*Id.* at 35, 42–43, 45.)  Munoz said Gonzales belongs to the 28th Street gang, which is one of the gangs included in Nevada Trece. (*Id.* at 49–50.)  Munoz testified California and Nevada gangs have an "on-sight" violence agreement, whereby "if the two come into contact with each other it is well-known that they will inflict" violence upon each other. (*Id.* at 42.)  Munoz identified photographs of injuries inflicted during detention by California gang members on Nevada gang members who showed allegiance to Nevada Trece, none of which involved Gonzales. (*Id.* at 55–56.)

Munoz testified that the drawing of a firearm and the number 28, and letters allegedly authored by gang members, but not by Gonzales, included remarks about waging war on other gangs. (*Id.* at 48–49, 52.)  Munoz, claimed Gonzales's moniker is "Spark Dog." (*Id.* at 50.)  Munoz identified an undated letter authored by "Spark Dog," as a recruitment letter and testified that the letter, "demonstrates and supports the ideology within the Nevada 13 or Nevada Trece structure" and "their goal . . . to unite all Nevada gangs together to represent their state." (*Id.* at 50–51.)  Munoz testified that Gonzales's tattoos along with that letter show he was at one point an influential member and leader of Nevada 13. (*Id.* at 58.)

Munoz was of the opinion that Gonzales was not just a gang member, but a gangster, who had "commanded respect" from others within the Nevada 13 prison gang when he was in prison for the manslaughter of a rival gang member. (*Id.* at 62.)  Munoz believed Gonzales had the ability to manufacture weapons and the mentality to use them if confronted with a rival gang member in jail and it was Munoz's opinion that "any gang member associated with any gang is capable of committing any type of violent act." (*Id.* at 63–64.)

### b.   Testimony about Prior Convictions and Pending Charges

Detective Stovall identified certified copies of the Judgments of Conviction for Gonzales's prior convictions of possession of a stolen vehicle in 1999 and burglary and attempted grand

larceny in 2001. (ECF No. 35-1 at 70–74.)   Metro Detective Tate Sanborn testified, without personal knowledge and based on a police report prepared by someone else, that Gonzales pleaded guilty to voluntary manslaughter with a gang enhancement after he was arrested in 1999 and that Gonzales had confessed that he stabbed a rival-gang member.   Sanborn identified the certified Judgment of Conviction. (*Id.* at 29–32.)

Detective Stovall testified about the stolen-vehicle case that arose while Gonzales was out on bail for the robbery case. (*Id.* at 66.)  Stovall said Gonzales was arrested in a stolen vehicle that contained a short-barreled shotgun. (*Id.* at 68.)  Gonzales's mother reported the vehicle stolen and said Gonzales took it without authorization. (*Id.* at 67–69.)  Stovall said Gonzales was arrested for several felony charges in that case, including ex-felon in possession of a firearm, but Stovall was not aware whether the case was resolved. (*Id.* at 69, 73–74.)

Detective Sanborn testified he investigated the murder case, i.e., the shooting death of Eric Montoya in January of 2014 while Gonzales was released in the robbery and stolen-vehicle cases. (*Id.* at 9.)  Sanborn testified there was no gang conflict between Montoya and Gonzales. (*Id.* at 33.)  Sanborn learned Gonzales and Montoya knew each other and that Gonzales knew Montoya lived with his girlfriend and three small children. (*Id.* at 27–28.)  Witnesses said there had been no problems between Gonzales and Montoya before the shooting, but the investigation led to identification of Gonzales aka Sparks as the potential shooter. (*Id.* at 10–11, 25.)

Detective Sanborn testified he interviewed Gonzales, and that although Gonzales initially denied shooting Montoya, he later admitted to Sanborn that he fired "four shots from a .357 revolver that he had with him through the front door of [Montoya's] residence." (*Id.* at 13, 17, 27.) Gonzalez told Sanborn he believed his girlfriend (codefendant Ramirez in the robbery case), with whom Gonzales had a tumultuous relationship, and who was Montoya's niece, asked Montoya to beat up Gonzales. (*Id.* at 12–13.)  The police found five shots through the front door of Montoya's residence, including two that struck and killed Montoya, but no cartridges, so they concluded the shooter used a revolver. (*Id.* at 9, 18.)  Sanborn testified the police found a revolver in Gonzales's vehicle. (*Id.* at 13–14.)  No forensic results were available from the murder case at sentencing in the robbery case. (*Id.* at 19.)

The Pre-Sentence Investigation Report stated that Gonzales "[r]eported he was a past member of the 28th Street Gang, (Scope reflects a tattoo on his head (XXV3))," but that he "states he is no longer affiliated with any gang." (ECF No. 40-1 at 4.)

### c.    Pronouncement of Sentence

The State argued for a sentence of Life Without the Possibility of Parole as a Large Habitual Criminal, contending that Gonzales's prior felony convictions, leadership of Nevada 13 and 28th Street,  as evidenced by his tattoos and the testimony of Detectives Munoz and Stovall, suggest he is a danger to the community and has a propensity for violence. (ECF No. 35-1 at 95–97.)

The sentencing court noted it received certified copies of three prior felony convictions that "[i]n the Court's opinion, open the door for the Court to consider enhancement under 207.010 [the habitual criminal punishment statute], so let's be clear that that is—I've made that finding that is an option now." (*Id.* at 97–99.)  The sentencing court stated, "Defense counsel has argued previously that I should sentence under the structure, the 1 to 15 or 2 to 15 structure.  The Nevada law allows for count 2 and a 1 to 6 structure for count 1.  But it's all on the table right now as a function of prior history." (*Id.* at 98–99.)

Defense counsel asked the court to follow the sentencing recommendation in the presentence report for concurrent sentences within the statutory sentencing range. (*Id.* at 134–35.) Gonzales personally addressed the court, stating, "I was already in a process staying away from these individuals and I was not living my life gangbanging out there on the streets." (*Id.* at 113–14, 134–35.)  He called his girlfriend, Rodriguez, to testify at his sentencing that he "wasn't out there committing crimes and gangbanging"; however, she invoked the Fifth Amendment. (*Id.* at 108–11.)  Gonzales stated that he was not "institutionalized" and that during his release he was "doing all right" and made a living as a tattoo artist out of his garage. (*Id.* at 113–14, 127–28.)

The state district court sentenced Gonzales as a Habitual Criminal to two concurrent terms of imprisonment for Life Without the Possibility of Parole:

> THE COURT:  All right.  Let's put a finer point on what I believe to be the appropriate standards by which a measure of the evidence and the evidence I'm going to consider is a component of the sentence decision.

///

I have mentioned *United States versus Watts* at 519 U.S. 148. U.S. Supreme Court in that case gives direction to lower courts saying that sentencing courts reliance on information that a defendant has been involved in multiple prior burglaries for which he has not been convicted is—can be considered highly relevant, if not essential to the Judge's selection of an appropriate sentence, is the possession of the fullest information possible concerning the defendant's life and characteristics.

They go on by—and state, very roughly speaking, relevant conduct corresponds to those actions and circumstances that Courts typically take into account when sentencing, prior to guidelines enactment, 'cause we're talking in a federal context here. This is a federal case. In determining the sentence to impose, whether departure from guidelines is warranted, the Court may consider without limitation any information concerning the background character and conduct of the defendant, unless otherwise prohibited by law.

So what does the law permit? Nevada law permits sentencing to consider— a sentencing judge to consider information or accusations founded on facts supported only by—actually, it says you're not permitted—I am not permitted to consider facts that are not [sic] supported by impalpable or highly suspect evidence. But if the evidence is not impalpable or highly suspect, I am allowed to consider it.

*Rippo* also goes on at 113 Nevada, 1239 and talks about the primary concern with respect to finding aggravated circumstances and that's a penalty case, a penalty murder case. That the act—accused is given notice and ensured—to ensure due process and that any new evidence, which might be presented can be considered. And that's why I was stressing at an earlier hearing that there be a full explanation and disclosure of the facts and why I'm glad that [defense counsel] is representing Mr. Gonzales in this effort, because you have intimate knowledge of the new allegations that are in a different department and could address them as a component of this sentence.

I—as a Judge, I've sentenced hundreds of people and I'm able as a function of that I think, by training and effort to parse out and select what pieces of information I believe and consider as a function of evidence. This one has been more challenging, because not only am I asked to look at a prior history, as you talked [defense counsel], the prior convictions and a life lived well or not; before the events that are relevant to a determination, I'm asked in this case to look forward from the date of entry of plea and allegation to consider very powerful information that has not been proved beyond a reasonable doubt as a component.

And, frankly, I'm going to be honest here, I can't—the information is compelling; I can't separate myself from that. It's hard. I cannot say that the new allegations that pending—are pending in a different department aren't a component and can't be—aren't a component of my analysis.

So I ask what's the standard I apply to that new evidence? If it's highly suspect or impalpable is the standard for the prior, in terms of its admissibility arguably. What's the standard after? And so I struggled with that. I'm going to make the record clear here, but I look to *United States versus Jordan* it's a Federal Court of Appeals decision out of the 9th Circuit from 2009, so it's fairly recent law that talks about due process analysis and a finding of clear and convincing evidence that an individual charged and facing sentencing, participated in three uncharged robberies.

///

And so the federal courts have said in there that the—to have looked forward with the new allegations of homicide and murder, that the standard should be—my standard should be clear and convincing. So what do I have? I have a detective, a homicide detective who testifies in front of me that the Defendant confessed to basically engaging in this shooting. That he had a weapon. That he admitted he had a weapon and he discharged that weapon multiple times and a man died.

That's clear and convincing to me. If the man's own words—if Mr. Gonzales' own words, he challenges those and the voluntary nature of those statements, but those are words to the detective that he involved himself in that homicide. That meets the standard. That means to me that murder or that homicide or what level your trier of fact determines or however that works out in the future remains to be said, but it's still a homicide. You possessed a weapon when you had three prior felonies and you shouldn't even have had a weapon. So that's all coming in as a component.

Everything I see in Mr. Gonzales' history talked about violence. And he took a life at a young age and he continues to involve himself. We haven't even talked about his juvenile history that's outlined on page 3, where he was committed to Nevada Youth Training center on the first petition, on a first petition in '97 for discharge of a firearm. He's also per page 3, committed to that training center and paroled ultimately or it looks like his parole expires in '98 for battery by a prisoner. So even at that young age, as a juvenile, Mr. Gonzales was violent. So I have to say—and he's a tattoo artist, but I don't have substantial information and evidence that was—when he was in the community he lived a positive structure law-abiding life.

It really only takes me one direction to structure the sentence here from the top. And in accordance with the laws of the State of Nevada my decision is I adjudicate Mr. Gonzales habitual criminal. I structure from the top of the range, count 1, life without the possibility of parole; count 2, life without concurrent . . . .

(ECF No. 35-1 at 136–39.)

## 2.    Applicable Legal Principles

The Supreme Court has emphasized that "the sentencing authority has always been free to consider a wide range of relevant material." *Dawson v. Delaware*, 503 U.S. 159, 164 (1992) (citing *Payne v. Tennessee*, 501 U.S. 808, 820–821 (1991); *United States v. Tucker*, 404 U.S. 443, 446 (1972)* ("[A] judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come"); *Williams v. People of State of N.Y.*, 337 U.S. 241 (1949)).

The Constitution does not erect a *per se* barrier to the admission of evidence concerning one's beliefs and associations at sentencing simply because those beliefs and associations are protected by the First Amendment. *Dawson*, 503 U.S. at 165. In *Dawson*, the Supreme Court held the First and Fourteenth Amendments prohibited the introduction in a capital sentencing

proceeding of the fact that the defendant was a member of an organization called the Aryan Brotherhood, because it had no relevance to the issues being decided in the proceeding. *Id.* at 160. The Court noted "the Aryan Brotherhood evidence was not tied in any way to the murder of Dawson's victim." *Id.* at 166.  The Court noted that "[i]n many cases, for example, associational evidence might serve a legitimate purpose in showing that a defendant represents a future danger to society," i.e., by showing "[a] defendant's membership in an organization that endorses the killing of any identifiable group, for example, might be relevant to a jury's inquiry into whether the defendant will be dangerous in the future." *Id.*  The Supreme Court concluded that Dawson's First Amendment rights were violated by the admission of the Aryan Brotherhood evidence because the evidence proved nothing more than Dawson's abstract beliefs. *Id.* (citing *Texas v. Johnson*, 491 U.S. 397, 414 (1989) ("[T]he government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable").  Because the state did not demonstrate a link between Dawson's membership and future harmful conduct, there was a substantial danger the sentencer considered the membership solely because it found that membership "morally reprehensible." *Id.* at 167.

In Nevada, a court may "consider facts and circumstances which clearly would not be admissible at trial." *Silks v. State*, 92 Nev. 91, 93–94, 545 P.2d 1159, 1161 (1976).  "So long as the record does not demonstrate prejudice resulting from consideration of information or accusations founded on facts supported only by impalpable or highly suspect evidence," the Supreme Court of Nevada will not interfere with the sentence imposed. *Id.*  For example, the Supreme Court of Nevada reversed the imposition of a sentence where a state district court unexpectedly and improperly relied on its unsubstantiated belief that the defendant was a gang leader, even though the sentence was within statutory range for robbery, where gang affiliation was not at issue and there was no evidence relating to gangs at trial. *Norwood v. State*, 112 Nev. 438, 439, 915 P.2d 277, 278 (1996).

### 3.      State Court Determination

The Nevada Court of Appeals determined the state district court did not abuse its discretion when it considered evidence of Gonzales's gang association at sentencing because Gonzales raised

the issue by asserting he was not involved in gang activity and the evidence was relevant to assess

Gonzales's criminal history and potential future dangerousness:

> Gonzales also argues the district court abused its discretion in considering evidence of gang association at sentencing. We disagree. Gonzales raised this issue by asserting in his presentence investigation report that he was not involved in gang activity. Thereafter, the district court requested testimony regarding this issue. We do not fault the district court for seeking to determine the truth of Gonzales' assertions, nor was it improper for the district court to consider evidence of Nevada gangs and Gonzales' gang affiliations given that this evidence was relevant for the district court's determination of Gonzales' criminal history and potential future-dangerousness. *See* NRS 176.015(6) (the district court may consider "any reliable and relevant evidence at the time of sentencing"); *Witter v. State*, 112 Nev. 908, 921, 921 P.2d 886, 895 (1996) (noting gang evidence may be admissible to establish a defendant's future dangerousness) (abrogated on other grounds).

(ECF No. 14-9 at 5 n.5.)

### 4.   Analysis of Ground II

The state appellate court's determination is objectively reasonable and is neither contrary to nor constitutes an unreasonable application of *Dawson*. Although the convictions, and even the pending charges, allegedly had nothing to do with gangs, Gonzales was previously convicted of killing a rival-gang member while Gonzales was a member of the 28th Street gang. (ECF No. 35-1 at 29–32.) Although Gonzales claimed he was no longer "gangbanging" and no longer a member of a gang (ECF No. 40-1 at 4), there was testimony that his prominent tattoos evinced his commitment to and leadership of the gang. *See supra* at pp. 22–24.

Reasonable jurists could conclude that the evidence of Gonzales's membership and leadership of the 28th Street and Nevada Trece/Nevada 13 gangs, inside and outside prison, and the objectives of the gangs and their endorsements and examples of violence toward suspected and actual rival gang members resulting from those beliefs inside and outside of prison, demonstrated a link between Gonzales's gang association and his abstract beliefs and was relevant to his potential for future harmful conduct. Reasonable jurists could furthermore conclude such evidence was relevant to the sentencing court's determination of Gonzales's future dangerousness and informed the sentencing court's exercise of its discretion in determining the ultimate sentence

among the available options. *Dawson*, 503 U.S. at 166. Thus, Gonzales is not entitled to federal habeas relief for Ground II.[6]

### C.    Ground III—Consideration of Pending Charges at Sentencing

Gonzales alleges his rights to due process, equal protection, and fair sentencing were violated when the trial court adjudicated him a Habitual Criminal based on allegations for which he was not at the time convicted. (ECF No. 27 at 17.) He claims the "testimony about the murder charge was inflammatory and the sentencing court admitted the evidence influenced its decision" and thus "the testimony was improper" and "highly prejudicial." (*Id.* at 21.) He contends the state appellate court unreasonably determined the sentencing court did not rely upon the pending charges for its Habitual Criminal adjudication because the sentencing court stated that it could not say that the pending new allegations "aren't a component of [the sentencing court's] analysis." (ECF No. 52 at 27–28.) Respondents contend this claim has no merit, the state court of appeals reasonably rejected this claim because the trial court properly considered the pending murder case in adjudicating Gonzales as a habitual offender, and any error was harmless. (ECF Nos. 42 at 16–18; 52 at 22–28.) For the reasons discussed below, the Court concludes the state appellate court's determination that the sentencing court's use of the pending charges was appropriate, is objectively reasonable and Gonzales is not entitled to habeas corpus relief for Ground III.

### 1.    Applicable Legal Principles

"Few limitations are imposed on a judge's right to consider evidence in imposing a sentence, and courts are generally free to consider information extraneous to the presentencing report." *Denson v. State*, 112 Nev. 489, 492, 915 P.2d 284, 286 (1996). A court at a sentencing proceeding may consider facts and circumstances that would not be admissible at trial. *Silks*, 92 Nev. at 94, 545 P.2d at 1161. A court is vested with wide discretion regarding sentencing, but the Nevada Supreme Court "will reverse a sentence if it is supported solely by impalpable and highly suspect evidence." *Renard v. State*, 94 Nev. 368, 369, 580 P.2d 470, 471 (1978); *Silks*, 92 Nev. at

---

[6] Gonzales's reliance on *Kennedy v. Lockyer*, 379 F.3d 1041, 1055 (9th Cir. 2004) for the argument that "evidence relating to gang involvement will almost always be prejudicial and will constitute reversible error," is misguided. (ECF No. 52 at 22.) *Kennedy* concerned the admission of evidence relating to gang-involvement in determining guilt during a jury trial; not a sentencing court's consideration of such evidence for determining potential future dangerousness. *Kennedy*, 379 F.3d at 1055–56.

94, 545 P.2d at 1161. A court may consider defendant's uncharged crimes "solely for the purpose of gaining a fuller assessment of the defendant's life, health, habits, conduct, and mental and moral propensities." *Denson*, 112 Nev. at 494, 915 P.2d at 287 (quoting *Williams*, 337 U.S. at 245).

Crimes for which the defendant has never been charged or convicted may be considered at sentencing if proved by a preponderance of the evidence; however, a court must refrain from punishing a defendant for the uncharged crime. *See United States v. Watts*, 519 U.S. 148, 151–52, 157 (1997) (holding jury's acquittal does not prevent sentencing court from considering conduct underlying acquitted charge, if that conduct is proved by a preponderance of the evidence); *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 573, n.19 (1996) ("A sentencing judge may even consider past criminal behavior which did not result in a conviction."); *Nichols v. United States*, 511 U.S. 738, 747 (1994) (recognizing prior convictions and past criminal behavior, even if no conviction resulted, may be considered); *Williams*, 337 U.S. at 244 (holding court did not violate due process when it considered references in a pre-sentence investigation report to 30 burglaries in the vicinity of the murder for which the defendant was sentenced, even though defendant was not yet convicted of the burglaries, but confessed to some and was identified as the perpetrator of others).

When a sentencing factor has an extremely disproportionate effect on the sentence relative to the offense of conviction, the Ninth Circuit has held that due process requires the government prove the facts underlying the enhancement by clear and convincing evidence. *United States v. Jordan*, 256 F.3d 922, 927 (9th Cir. 2001) (stating "there may be an exception to the general rule that the preponderance standard satisfies due process when a sentencing factor has an extremely disproportionate effect on the sentence relative to the offense of conviction.") (relying on *United States v. Hopper*, 177 F.3d 824, 833 (9th Cir. 1999) and *McMillan v. Pennsylvania*, 477 U.S. 79, 87–91 (1986), *overruling on other grounds recognized by United States v. Haymond*, 139 S. Ct. 2369, 2378 (2019).

### 2.   Analysis of Ground III

The state appellate court determined: "The record reflects the district court did not rely on the pending murder charges in adjudicating Gonzales a Habitual Criminal. Further, the district court could consider evidence of the murder charges in crafting the sentence. *See* Nev. Rev. Stat.

§ 176.015(6) (the district court may consider "any reliable and relevant evidence at the time of sentencing."). (ECF No. 14-9 at 4 n.4.)

The record belies the claim that the sentencing court adjudicated Gonzales a Habitual Criminal based on the pending murder charges.  Before pronouncement of the sentence (ECF No. 35-1 at 136–39), the State presented witnesses and some argument concerning the pending murder and stolen vehicle cases (*Id.* at 8–98).  The sentencing court interrupted to note that it received in evidence certified copies of three prior felony convictions that "[i]n the Court's opinion, open the door for the Court to consider enhancement under 207.010 [the habitual criminal punishment statute], so let's be clear that that is—I've made that finding that is an option now." (*Id.* at 98–99.) Thus, the Habitual Criminal adjudication was based on the three prior felony convictions.

Gonzales contends the evidence of the pending murder charges was inflammatory; however, the sentencing court acknowledged that it had the capacity, through its experience having sentenced "hundreds of people" to "parse out and select what pieces of information" the court believes and consider it as a function of the evidence. (ECF No. 35-1 at 137.)  Although the sentencing court admitted the pending murder charges were compelling and were a component of the court's analysis, the court acknowledged it could not make use of "impalpable or highly suspect" evidence. (*Id.* at 137–38.)  It appears that in an abundance of caution, the sentencing court relied on the Ninth Circuit's heightened proof standard for charged but unproven offenses set forth in *Jordan*, 256 F.3d at 927, when it determined the murder charge was proved by clear and convincing evidence (rather than a preponderance of the evidence), based on Detective Sanborn's testimony that Gonzales confessed to him that he discharged a firearm multiple times causing Montoya's death. (*Id.* at 13, 138.)  Thus, the subsequent pronouncement of the sentence was permissibly based in part on the alleged conduct involved in the murder case.  Moreover, the sentencing court stated that in exercising its discretion in choosing the sentence, among those available as a Habitual Criminal, it considered "information concerning the background character and conduct of" Gonzales, including his repeated acts of violence and use of weapons despite the fact that he was not permitted to possess a weapon and had opportunities to alter his behavior but "continues to involve himself." (*Id.* at 137–39.)

The state appellate court reasonably determined the state district court's use of the pending charges was used appropriately in crafting the sentence. Therefore, Ground III is denied.

**V.   Certificate of Appealability**

This is a final Order adverse to Gonzales.  Rule 11 of the Rules Governing Section 2254 Cases requires the Court to issue or deny a certificate of appealability ("COA").  Therefore, the Court has *sua sponte* evaluated the claims within the petition for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864–65 (9th Cir. 2002).  "To obtain a COA under § 2253(c), a habeas prisoner must make a substantial showing of the denial of a constitutional right," and for claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 483–84 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).  Applying these standards, a COA is warranted for Grounds I and II of the Petition as reasonable jurists could debate or find wrong the Court's assessments whether deference is owed to the state appellate court's determinations or the Court's assessment of the constitutional claims.

**VI.   Conclusion**

**IT IS THEREFORE ORDERED:**

1.   Petitioner Raul Gonzales's Second Amended Petition for writ of habeas corpus under 28 U.S.C. § 2254 (ECF No. 27) is **DENIED**.

2.   A Certificate of Appealability is **GRANTED for Grounds I and II** of the Petition.

3.   All requests for an evidentiary hearing are **DENIED**.

4.   The Clerk of Court is directed to enter Judgment accordingly and close this case.

DATED:  April 26, 2024

_____
GLORIA M. NAVARRO
UNITED STATES DISTRICT JUDGE